### UNITED STATES DISTRICT COURT
#### for the Eastern District of Virginia
#### Norfolk Division

EVONNE BRYANT, et al,

     Plaintiffs,

v.                                      Case No. 2:20-cv-00026

CITY OF NORFOLK, et al,

     Defendants.

### MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

NOW COMES the City of Norfolk ("the City"), by counsel and pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, and as and for its Memorandum in Support of Motion to Dismiss, states as follows:

### Preliminary Statement

This motion is based on a lack of standing to bring this lawsuit.

Contrary to the allegations of the Amended Complaint, the City's Redevelopment Plan ("Plan")[1] has broad support not only throughout the City, but in the very neighborhood most affected by the Plan.  It is undisputed that Tidewater Gardens is one of the highly segregated, densely populated and impoverished communities in the City.  It is further undisputed that most buildings making up this public housing project are long past their useful life and overdue for demolition.  Indeed, interest in vacating this community is widespread.

The residents of Tidewater Gardens have made clear that they would rather vacate these neighborhoods than to live in a poverty stricken, high density public housing project.  With the

---

[1] While the City refers to the Redevelopment Plan as the "City's Plan," in fact the Redevelopment Plan is part of a joint effort involving both the City and Defendant Norfolk Redevelopment and Housing Authority.

I-1678575.5

interest of its citizens in mind and over the course of more than a decade the City came up with the Plan to replace this segregated, high density housing project with less dense units.  The Plan provides residents with the option of returning to this redeveloped area or leaving the housing project altogether.  Under the Plan, the City can accommodate *all* of the residents of Tidewater Gardens either by offering units in the redeveloped housing project or by providing Housing Choice Vouchers ("HCVs") based on the residents' stated preference.  Nonetheless, two entities and four individuals have sued the City claiming that implementation of the Plan will damage them.

The individual named Plaintiffs who resided in Tidewater Gardens and claim standing to sue have suffered no injury as a result of the City's Plan as (1) they have testified that they already relocated to *better* housing, (2) they will have the opportunity to return to Tidewater Gardens once the redevelopment is completed, and (3) they retain the option of using HCVs to move to the affordable housing of their choosing.  Without an injury, these individuals have no standing.

Plaintiff "Residents of St. Paul's Quadrant Tenant Group" (the "Tenant Group") claims standing to sue as it purports to represent the residents affected by the City's Plan.  But, the testimony of its designee demonstrates that it is not an entity at all as (1) there is no identified membership, (2) there are no officers, directors or any leaders whatsoever, and (3) there are absolutely no governing documents that would identify the Tenant Group as an existing entity.  Indeed, the individual designated to testify concerning the group's identity was unable to provide any information whatsoever on the details of the organization or its membership.  As an illusory entity at best and no entity at all at worst, the Tenant Group has no standing.

Plaintiff "New Virginia Majority" offers the most convoluted path to standing, alleging

2

that its work to protect the health and safety of Black residents near Lamberts Point from coal ash contamination is hampered by virtue of relocations associated with the City's Plan because of the difficulty in establishing long term relationships with residents directly affected by the Plan.  Of course, the residents affected by the Plan are miles from Lamberts Point which begs the question of why New Virginia Majority's "coal ash advocacy" efforts have anything to do with the City's Plan.  It does not.  Instead, New Virginia Majority claims that it has "diverted" its resources to organizing the St. Paul's residents to oppose the City's Plan.  New Virginia Majority cannot "create" standing by making the conscious decision to divert resources from its coal ash campaign and into organizing opposition to the City's redevelopment Plan.

## The City's Plan and Plaintiffs' Opposition

To better understand why the Plaintiffs have suffered no injury it is important to consider the City's Plan, and the Plaintiffs' opposition to the Plan.  The Plan is reflected in the City's Choice Neighborhoods Initiative ("CNI") which is incorporated by reference into the CNI Grant Agreement which Plaintiffs submitted to the court as Exhibit A (Doc. #60-1) to their Memorandum in Support of Motion for Injunctive Relief (Doc. #60).  The CNI Grant Agreement specifically defines "an approved Transformation Plan" as reflected in "the most recent set of documents" submitted to HUD, including "Grantee's Choice Neighborhoods Application."  A copy of the CNI Application ("Application") is attached hereto as **Exhibit 1**.

Tidewater Gardens was built in the mid-1950s, when racial segregation and discrimination were the *de facto*, if not the *de jure*, policies of the Commonwealth.  These policies had serious, long-term consequences.  Tidewater Gardens was built on a filled-in creek, with more than half of its units within the 100-year floodplain.  The quality of construction and the construction techniques used left the buildings (and therefore the residents) vulnerable to a

3

variety of maladies:  functional obsolescence of the buildings, a lack of central air-conditioning, the ubiquitous lead paint used prior to the 1970s, the cracking of underground sewer lines (many of which ran under the concrete slab on which the buildings were constructed), and the social isolation caused by the super-block row pattern.  Application Ex. D, "Need-Design Deficiencies" at pp. 26-28.  To make matters worse, Tidewater Gardens routinely suffers from flooding caused by the intermittent tidal and rainfall driven in part by the more than one-foot rise in sea level.  As a result, Tidewater Gardens and the surrounding streets often become impassable during heavy rains and when coastal tides are high.  *Id.* at Ex. E, "Neighborhood Narrative" at p. 29.  The City correctly concluded that Tidewater Gardens requires a complete redevelopment from the ground up.

The City took action to address these problems through its "Transformation Plan" first formalized in 2014, which envisions the ultimate redevelopment of all three public housing projects within the St. Paul's Quadrant.  Application Ex. A, "Executive Summary" at p.2.  The City rightly concluded that it could not possibly redevelop all three neighborhoods at the same time as it would require the relocation of many of the Quadrant's more than 1,600 families residing in the public housing.  *Id.*  Accordingly, the City concluded that the redevelopment should begin with a Neighborhood Plan involving Tidewater Gardens as it represents the public housing project with the greatest needs, and suffering from persistent flooding.  Application Ex. F, "Neighborhood Strategy" pp. 38-50.  As a result of this decision, the Plan under attack involves the redevelopment of only one neighborhood--Tidewater Gardens.

The City's Plan for Tidewater Gardens culminated in a public-private partnership, leveraging low-income housing tax credits, local funding sources, private investment capital, and an additional $30 million from the U.S. Department of Housing and Urban Development

4

("HUD"), through the CNI Program.  Application Ex. B, "Threshold Requirements" at p. 7.  This solution, which enjoys overwhelming community support, will relocate Tidewater Gardens to higher ground and make massive infrastructure improvements.  Application Ex. F at p. 4.  There will be a nearly total street realignment to integrate the neighborhood into the larger community of Norfolk.  *Id.*  Likewise, the Plan provides for the construction of a pump station to handle sewage, waterways to create blue-ways to mitigate flooding, and enhancing existing community assets.  *Id.*  The Plan calls for an orderly phased demolition of distressed and obsolete structures and redevelopment over the next four years.  Application Ex. G, "Housing Strategy" at pp. 53-54.[2]  In essence, this Plan into which the City has devoted so much of its time and resources will improve the lives of every single Tidewater Gardens resident.

The Plaintiffs allege that the City's Plan injures residents in that it amounts to nothing more than "gentrification" designed to force "Black residents of that area into segregated housing within Norfolk or out of the City, at least temporarily but also potentially forever." Amended Complaint ¶ 1.  The Plaintiffs claim the Plan "will deprive the City's Black residents of the benefits of a significant investment of federal funds" all in violation of the Fair Housing Act (the "Act").  These allegations are false.

As demonstrated herein, far from causing harm to the residents of Tidewater Gardens, the City's Plan *already* has improved the lives of the named Plaintiffs, and will indeed improve the lives of all the residents of Tidewater Gardens.  The Plaintiffs claimed that they were forced into "segregated poverty-stricken neighborhoods."  But every named Plaintiff has testified that they have moved into housing that is *better* than Tidewater Gardens in every respect.  The Plaintiffs

---

[2] The original Application called for "200 units as replacement housing" onsite with 109 units "as project-based vouchers within offsite developments…"  Application Ex. G at p. 53.  As a result of amendments to the Plan, the number of onsite replacement units has been increased to 226, with a corresponding decrease in offsite project-based voucher units.

5

claim that Norfolk is "gentrifying" Tidewater Gardens and intends to force residents out.  But the City has passed a resolution giving all residents the right to return if they choose to do so.  The Plaintiffs claim that the Plan imposes on the residents the burdens associated with moving.  But the City has taken the unprecedented step of including a $3 million annual line item in its budget devoted exclusively to providing assistance for and funding the cost of such relocation. Application Ex. A, "Executive Summary" at p. 5.  In essence, the City has eliminated any harm to the Plaintiffs and discovery has demonstrated as much.  But the Plaintiffs say that is not enough.

This lawsuit represents an effort to replace the City's Plan with a plan that (1) requires high-rise buildings resulting in greater density, (2) significantly increases the costs associated with the redevelopment, (3) undermines the residents' preference for low density units by requiring that they move into apartment buildings, (4) adds more than 500 additional units on property less than half the size of the original neighborhood, and (5) jeopardizes $30 million in federal funds by urging the adoption of this "alternative plan" that cannot possibly be completed by the statutory deadline (September 2025).

Plaintiffs are attempting to use the Act to impose on the City obligations that do not exist. While the City recognizes its obligation to provide affordable housing options to those displaced as a result of the Plan and fully intends to do so through a combination of replacement housing and the HCV program, Plaintiffs seek to impose on the City an obligation to spend millions of dollars more to create *additional* public housing to accommodate those who are *not* residents of Tidewater Gardens.  In other words, notwithstanding that the Plan drastically improves the housing for all Tidewater Gardens residents, Plaintiffs argue that the City has violated the Act because it is not solving all of the City's housing issues at the same time.

I-1678575.5

Because neither the named Plaintiffs nor any other resident in Tidewater Gardens or even in the St. Paul's Quadrant will be adversely affected as a result of the City's Plan, these Plaintiffs lack standing to challenge the Plan through the Act.  If the Plaintiffs lacked standing, there is no case or controversy and this court lacks subject matter jurisdiction.

**Factual Challenge to Standing**

A.     <u>The Standard for a Factual Challenge</u>

The Fourth Circuit has divided challenges to subject matter jurisdiction into two categories: facial challenges and factual challenges.  *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).  A facial challenge occurs when the defendant argues that even if the allegations in the complaint are taken as true, the facts alleged do not establish subject matter jurisdiction. *Id*.  A party makes a factual challenge when it contends "that the jurisdictional allegations of the complaint [are] not true."  *Id*. (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)) (alteration in original).

Unlike a facial challenge, which is reviewed using a standard akin to that used for a 12(b)(6) motion, when evaluating a factual challenge the court can consider evidence outside of the pleadings and can conduct an evidentiary hearing and, from the evidence presented to it, decide disputed jurisdictional facts absent any presumption that the Plaintiffs' allegations are correct.  *Id*.; *see also Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) ("In this posture, 'the presumption of truthfulness normally accorded a complaint's allegations does not apply.'") (quoting *Adams*, 697 F.2d at 1219).  In this procedural posture the burden is on the Plaintiffs to prove that subject matter jurisdiction exists.  *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995).

The City filed its original Motion to Dismiss for lack of standing on March 16, 2020, representing to the court that the motion was a factual challenge requiring discovery in order to

I-1678575.5

demonstrate that the allegations of the Complaint concerning standing were not true.[3]  Factual

discovery is now complete and the City is filing this brief in support of this renewed Motion to

Dismiss for lack of standing based on the testimony of both the individual named Plaintiffs and

the designees for the entity Plaintiffs which testimony demonstrates that certain of the allegations

are not true as these Plaintiffs have not been injured as a result of the City's conduct as alleged in

the Amended Complaint.

B.      The Entity Plaintiffs Lack Standing

        1.      *Residents of St. Paul's Quadrant Tenants Group*

The Tenant Group lacks standing as it is an illusory entity.

        The Amended Complaint alleges that the Tenant Group is an unincorporated association

and implies that all the tenants living in St. Paul's Quadrant are members of the Tenant Group

and that the Tenant Group's mission is to "advocate for the rights of residents and encourage the

City and the NHRA to develop adequate and affordable replacement housing within the St Paul's

Quadrant or high opportunity areas in Norfolk."  Amended Complaint ¶ 12.

        In its original motion the City challenged the factual allegation that the Tenant Group is

an unincorporated association with the capacity to file a lawsuit.  The testimony of the Tenant

Group's designee demonstrates that the entity is illusory at best and nonexistent at worst.  As

part of its attempt to discover the factual basis for the allegations of the Complaint, the City

noticed the deposition of the Tenant Group on certain specific topics including the Group's

governing documents, the Group's leadership (including the identity of its officers and directors),

the requirements for membership and the identity of members.  The Tenant Group designated

---

[3] By order dated February 26, 2021, the Court denied all pending motions, including the City's
Motion to Dismiss, without prejudice, advising that "the parties may file or renew any
appropriate motions."  The City now files its Motion to Dismiss in response to the Plaintiffs'
Amended Complaint.

LaVonne Pledger to testify on its behalf.  The testimony demonstrates that, in reality, the Tenant

Group does not exist.

First, Mr. Pledger testified that he has no knowledge of any documents which govern the

Tenant Group.  There are no articles, bylaws or rules and regulations.  Indeed, it appears there

are no organizing documents at all:

> Q.      Are there any organizing documents for the Tenant Group?  Do you have articles, bylaws, anything like that?
>
> A.      Articles, bylaws?  We have a few things that kind of drafted together that I would consider articles, not necessarily bylaws.
>
> Q.      Alright.  I haven't seen them.  Are they maintained somewhere?
>
> A.      Yes, New Virginia Majority keeps a pretty good record of our meeting agendas.  Like we have those.  We – like I said, we have our sign-in sheet.  We have, you know, a couple of documents we, as a group, drafted together.
>
> Q.      What are they called?  And the reason I ask is maybe I have them, and I just don't recognize them for what they are.
>
> A.      We have the – give me a second.  I'm trying to remember the exact name. The Public Housing Tenant Bill of Rights document that we all drafted together.
>
> Q.      … Aside from that Bill of Rights document, do you have any other organizing documents, bylaws, anything like that?
>
> A.      Let's see, I would like to say that yes, but I don't attend every single meeting, and I am not the secretary, so I wouldn't keep a specific account of that information.  But I'd like to think that we do.

Pledger Dep. at 33-34 (excerpts attached as **Exhibit 2**).  Setting aside that one of the topics for

which Mr. Pledger was designated was the Tenant Group's organizing documents, in fact no

such documents exist, as they have never been produced in this case.

The same applies to the Tenant Group's leadership.  While it was difficult to get Mr.

Pledger to commit that there are no officers or directors, he eventually had to concede as much,

as reflected in his testimony:

> Q.      … Can you tell me how its leadership is structured?

> A.      I don't – there is not – how its leadership is structured?  We have our – our meeting facilitators and organizers, which is, you know, the folks from New Virginia Majority, typically Lafeetah Byrum and Monet Johnson.  They help facilitate the meeting and they help us with you know, note taking and secretarial type work typically.
>
> …
>
> Q.      Alright.  I'm really interested in who leads the Tenant Group.  As an example, and I'm trying to be more specific, do you have a president of the Tenant Group?
>
> A.      We – we don't have a president but we do have a – like, -- there's a structural kind of order.
>
> …
>
> Q.      You don't have a president?
>
> A.      No, we do not have a president.
>
> Q.      Do you have board members?
>
> A.      No, we do not have board members.

Pledger Dep. at 35-36.

When asked how disputes are resolved, Mr. Pledger explained that the Tenant Group will typically "put everything to a vote."  When questioned about the process, he was, again, noncommittal:

> Q.      Are those votes recorded?
>
> A.      I'm not the secretary, but I believe so.

*Id.* at 37.  Indeed, on several occasions, Mr. Pledger deflected questions by referring specifically to the organization's secretary.  (*Id*. at 17; ("I'm not the secretary"); *Id*. at 20 ("I'm not the secretary") *Id*. at 37 ("I am not the secretary")).  This naturally led to a simple question:

> Q.      In response to some of my questions, you have said, "well, I am not the secretary."  Do you have a secretary?
>
> A.      Not – not formally.  But we do – like I said, our facilitators take on most of that – that role, that's why I refer to them as facilitators.  Well, I guess I should say facilitators from now on.

*Id.* at 38-39.  Eventually, the frustration was reflected in questions specifically designed to

determine if there are any officers at all and to determine if the "facilitators" were officers:

> Q.      Well, I am – I feel like we're playing hide the ball here.  I'm just trying to find out if there's a secretary, because you referred a couple of times to the fact that you are not the secretary.
>
> A.      Okay.  Yes, I did refer to that.
>
> Q.      Okay.  Who is the secretary?
>
> A.      Okay.  When I said that I – I'm not the secretary, those are the types of duties that – you know, a secretary records the minutes.

*Id.* at 163.  Even then, Mr. Pledger was evasive, but finally responded to the ultimate question:

> Q.      Is there – are there any officers?
>
> A.      I – "deja vu."  I don't – I think we've been through that before.
>
> Q.      So – so is it – you would agree with me that the Tenant Group has no officers.
>
> A.      Yes.
>
> Q.      Okay.  And your references to a secretary was to just generally what a secretary would normally do, and not necessarily to a secretary in your group.  Is that accurate?
>
> A.      Yes.  So when I said that, it's more of a phrase.

*Id.* at 163-164.

Notwithstanding that one of the City's primary topics of discovery was membership,

when Mr. Pledger was unable to identify the members or state specifically what it takes to

become a member, counsel tried to simplify the question:

> Q.      … If I'm going to join a group, normally I fill out an application, it's processed, and I become a member of the group.  I'm wondering what process is there to becoming a member of the St. Paul's – or the Residents of the St. Paul's Tenant Group?
>
> A.      Well, it starts with people showing up.  If you show up to a meeting and, you know, you express your interest, you, you know, come back, you get involved, you do the work, and that – that – you know – but showing up is

generally the first step to become a member.

Q.      Alright.  So showing up is the first step.  Are you automatically a member
if you show up at one of the meetings?

A.      No, not –

Q.      Alright.  What – what – then what I'm trying to do is figure out the point
at which you do become a member.

Pledger Dep. at 17-18.  In fact, Mr. Pledger was unable to explain exactly what it takes to

become a member, but testified that "There's no paperwork to fill out other than, you know, you

putting your name and stuff and showing up."  *Id.* at 19.  After Pledger testified that the "group"

decides who becomes a member, he was questioned concerning "the mechanism by which the

group decides."  Once again, the elusive "secretary," came into play:

Q.      What is the mechanism by which the group decides?

A.      It's – it's an agreement – it's the – it's an agreement process, yes, but –

…

        and the – whoever is the secretary of the meeting will note that, you know,
that person is there, I mean, we just – the only time we've had to exclude people
is when City officials or Housing officials have showed up to our meetings.

*Id.* at 23.  Of course, Mr. Pledger could not identify the members, or the identity of the

"secretary" who is supposed to keep track of membership.

        LaVonne Pledger, as the Tenant Group's designee, binds the group to his testimony.

Mr. Pledger was unable to provide any information whatsoever concerning the group's

governing documents, organizational structure, leadership or membership.  Based on

Mr. Pledger's testimony alone, the Tenant Group is not an entity capable of filing suit.

        Under both Virginia law and federal law, the term "unincorporated association"

        denote[s] a voluntary group of persons joined together by mutual consent for the
        purpose of promoting some stated objective. Such an association suggests an
        organized group made up of persons who become members of the association
        voluntarily, but subject to certain rules or by-laws; the members are customarily

> subject to discipline for violations or non-compliance with the rules of the association. The word 'association' as here used refers to associations such as trade unions, fraternal organizations, business organizations, and the like.

*Yonce v. Miners Mem'l Hosp. Ass'n*, 161 F. Supp. 178, 186 (W.D. Va. 1958); *see also Sines v. Kessler*, 324 F. Supp. 3d 765, 806 (W.D. Va. 2018) (citing the definition of an unincorporated association used in *Yonce* with approval).  A group that lacks those characteristics is not an unincorporated association with the capacity to sue.  *See Yonce*, 161 F. Supp. at 185-86.

Now that discovery is complete, it is clear that the Tenant Group does not have the necessary formalities to constitute an unincorporated association with the capacity to sue.  There are no rules, bylaws, or disciplinary procedures for the Tenant Group.  Based on the deposition of the Tenant Group's designee on membership, the group does not even know its own members, so there is no way anyone else can know who the members are.  Implicit within the Amended Complaint's allegation that the group is an "unincorporated association" is an allegation that all of the members voluntarily joined the association and that there was mutual consent between the individual members and the group as a whole to each person's participation.  Discovery has demonstrated that this is simply not true.  The group was unable to explain how individuals become numbers or who they are, and it appears that the group identifies as its members anyone who simply shows up to a meeting.  There is no application process.  There is no vetting process.  There is no process for applying for membership or removing members.  As the Tenant Group is not a legitimate entity, if an entity at all, it has no standing.

### 2. *New Virginia Majority*

Contrary to the allegations of the Amended Complaint, New Virginia Majority has not suffered a cognizable injury in fact.  The alleged harm to New Virginia Majority is set forth specifically in its Answer to Interrogatory No. 9, which states in pertinent part as follows:

> … New Virginia Majority was heavily engaged in community organization

13

around the issues of climate justice in Norfolk, Virginia … This work required extensive door-to-door outreach to and education of residents of predominantly black, low income neighborhoods throughout the City.  Additionally, New Virginia Majority was engaged in a City wide effort "Shark City," which focused on organizing around displacement in Norfolk as a result of flooding due to climate change in the Norfolk 2100 vision plan.  Residents of St. Paul's Quadrant were heavily involved in these efforts.  As a result of the Redevelopment Plan, New Virginia Majority was forced to divert resources from and completely halt community organization and legislative activity focused on both coal storage and "Shark City" efforts to support the St. Paul's residents, also impacted by the coal dust from the train line, against the significant threat of mass displacement.

Pls.' Resp. to Interrog. No. 9 (Pls. Interrog. Resp. attached as **Exhibit 3**).  Put simply, the *only* injury identified by New Virginia Majority is that it had to divert resources from its "coal" issue surrounding Lambert's Point (miles from Tidewater Gardens) and from its "climate" issues generally.  However, it is well-settled law in the Fourth Circuit that an organization's choice to use resources to respond to a particular event as opposed to furthering the organization's usual activities is not an injury that creates standing because any harm to the organization is self-inflicted by virtue of its own choices.  *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012).  Therefore, the diversion of resources argument is not sufficient to give New Virginia Majority standing.

C.     The Individual Plaintiffs Lack Standing

Elected officials and policymakers within the City of Norfolk have concluded that the current Plan is in the best interest not only of the City and its citizens, but also in the best interest of the residents of Tidewater Gardens.  To help achieve its ultimate goal of reducing segregation and de-concentrating poverty, the City has proposed a mixed income development replacing 618 dilapidated units comprising the housing project with 710 "mixed-income" units which will occupy less than half the site as the remainder of the property must be devoted to flood abatement.  Plaintiffs do not like this project, and propose an alternative that increases the density by more than 500 units.  But the Plaintiffs are well aware that their mere "preference" for

14

this "alternative" cannot supplant the will of the elected officials.  Instead, as in any other federal case, the Plaintiffs must demonstrate that they have suffered some sort of "harm" before the court has jurisdiction to hear the case.

The principles of "standing" are aimed at determining whether a particular plaintiff is the type the law intends to protect against the type of harm of which the plaintiff complains.  The constitutional standing rules seek to ensure that a concrete "case or controversy exists by focusing on the plaintiff's harm."  As the Supreme Court has held, a plaintiff must demonstrate that his or her injuries "'fairly can be traced to the challenged action of the defendant,' or put otherwise, that the exercise of the Court's remedial powers would redress the claimed injuries." *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 74 (1978)(citation omitted). The Supreme Court's precedent imposes three requirements for establishing standing:  (1) an injury; (2) a causal connection between the injury and the complained-of acts; and (3) redressability.  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982).

According to the Amended Complaint, the "injuries" to the individual Plaintiffs are that they have been forced out of their homes and into poverty-stricken, highly segregated neighborhoods.  But the testimony of these Plaintiffs reveal that the opposite is true as they actively sought HCVs for the specific purpose of *leaving* Tidewater Gardens and all have testified that the housing they now occupy is better.  In essence, the hand-selected Plaintiffs named in the lawsuit demonstrated through their own testimony that, far from suffering injury or damage as a result of the City's Plan, they are now better-off.

The Fourth Circuit has held on numerous occasions that a plaintiff has no standing when the challenged conduct results in no harm or injury.  *See Benham v. City of Charlotte,* 635 F.3d

129 (4th Cir. 2011) (no standing absent demonstration of actual harm); *Beck v. McDonald*, 848

F.3d 262 (4th Cir. 2017) (unsubstantiated fears of harm are insufficient to create standing); *Cmty.*

*Stabilization Project v. Cuomo*, 199 F.R.D. 327, 333 (D. Minn. 2001) (organization lacks

standing in Fair Housing Act case if none of its members have standing because there is no

injury in fact to address).  By their own testimony, the Plaintiffs claim that, on balance, they are

better off in their current housing.  *See Egan v. Davis*, 118 F.3d 1148, 1150 (7th Cir. 1997)

(plaintiffs lack standing to challenge a process that on balance makes them "better off").

     1.    *Former Residents of Tidewater Gardens*

The individual named Plaintiffs who previously resided in Tidewater Gardens have no

standing as their individual testimony demonstrates not only that the Plan has had no adverse

impact on them, but in fact the Plan has *improved* the lives of the named Plaintiffs.  Importantly,

the testimony of the individual named Plaintiffs is *directly contrary* to the allegations of the

Amended Complaint as well as the discovery responses prepared by the Plaintiffs' lawyers.  The

City will address the lack of standing for each individual Plaintiff, along with the discrepancies

between the allegations of the Amended Complaint and the Plaintiff's testimony.

     (a)    Sylvia Givens

The specific allegations with regard to Plaintiff Sylvia Givens are set forth in paragraph 9

of the Amended Complaint which reads as follows:

> Plaintiff Sylvia Givens is a black woman who works as a cafeteria worker at a
> local hospital.  She resides in Calvert Square at 847 Bagnall Road, Norfolk.  She
> previously resided in Tidewater Gardens at 447 Chapel Street in Norfolk, Virginia,
> but NRHA relocated her due to hazardous mold levels in her home.  This unit is
> scheduled to be demolished as part of phase 1 of the Redevelopment Plan.

Amended Complaint ¶ 9.

Since the Complaint was vague with regard to the specific injuries suffered by Ms.

Givens as a result of the City's implementation of the Plan, the City propounded interrogatories

specifically designed to determine the nature of any injury or harm suffered by the individual

Plaintiffs.  Interrogatory no. 6 reads as follows:

> State specifically and separately for each Named Natural Person Plaintiff all injuries or harms each have suffered as a result of the FHA violations you allege the City has committed.

For Plaintiff Sylvia Givens, the sworn discovery response stated specifically as follows:

> Plaintiff Sylvia Givens is currently living under threat of losing her home as her apartment is slated to be demolished as part of the Redevelopment Plan.  She has already been forced to move once due to the conditions of her apartments in St. Paul's Quadrant, and will believes [sic] that she will have to move again into a highly segregated, high poverty area if she is forced to accept a voucher.

Plaintiffs' Answer to Interrogatory no. 6.

Ms. Givens' sworn testimony demonstrates that both the Amended Complaint and the

interrogatory response are not true.  First, Ms. Givens testified that she was glad to leave

Tidewater Gardens and secure an apartment at Calvert Square.

> Q.      Based on your testimony when you were being questioned by Ms. Acosta, it sounded to me like you were glad you were able to leave Tidewater Gardens and get a place in Calvert Square. Is that correct?
>
> A.      Yes, ma'am--yes, sir.

Givens Dep. at 70 (excerpts attached as **Exhibit 4**).  Indeed, Ms. Givens testified that her Calvert

Square unit is much better than the one she occupied at Tidewater Gardens:

> Q.      The Tidewater Gardens unit, at least your unit, as I understand it, you had various issues with it, and your Calvert Square unit is better.  Is that right?
>
> A.      Yes sir.
>
> Q.      Are you glad you are at Calvert Square, and not Tidewater Gardens now?
>
> A.      Yes, sir.

*Id.* at 70-71.

In short, by virtue of the City's Plan, Ms. Givens was given the opportunity to move from

Tidewater Gardens to a unit that she *prefers* in Calvert Square.  Accordingly, the allegation that

she is concerned about the Tidewater Gardens apartment being demolished has no basis in fact.

It is clear she cares little about the demolition of the Tidewater Gardens units, and is more

concerned about losing her unit in Calvert Square:

> Q.      My understanding with regard to the harm that you have suffered as a
> result of what the City has done, and that is the Redevelopment Plan, is that
> you're afraid you're going to lose your unit in Calvert Square.  Is that right?
>
> A.      Yes sir.

Givens Dep. at 73.  In reality, the Plan at issue does not involve Calvert Square, and there are no

present plans to demolish the neighborhood.  Nevertheless, based on information from her

counsel, Ms. Givens was under the impression that the Plan will result in the demolition of her

Calvert Square apartment.  Reading from the Plaintiffs' discovery responses, counsel questioned

Ms. Givens concerning her "harm":

> Q.      … and it says: "Plaintiff Sylvia Givens is currently living under the threat
> of losing her home as her apartment is slated to be demolished as part of the
> Redevelopment Plan."
>
> That--that's the harm--that you claim to--that you'll suffer as a result of the
> Redevelopment Plan; is that right?
>
> A.      Yes sir.

*Id.* at 73.

One of the allegations of the Amended Complaint is that the Tidewater Gardens residents

will not be able to return to the redeveloped neighborhood.  As Ms. Givens testified, both the

City and NRHA have assured residents that they would have the opportunity to return.

> Q.      Do you have any idea whether or not the City or NRHA have ever told
> residents of Tidewater Gardens that when the redevelopment is done, they'll have
> a chance to move back to the neighborhood?
>
> A.      Yeah, they told-I-I'm familiar with those words.
>
> Q.      When you say you're familiar with those words does that mean that you
> are aware of the fact that the City and NRHA have told residents that they could

18

move back when the redevelopment is finished?

A.      Yes sir.

Q.      Do you believe them?

A.      No.

Givens Dep. at 80.  Thus, even though the City and NRHA have repeatedly told the residents that

they could return if they want to (either to a Project Based Voucher ("PBV") unit or to a LIHTC

unit using HCVs) Ms. Givens does not believe the City.

More to the point, Ms. Givens' testimony makes clear that the right to return was of no

interest to her:

Q.      All right.  Would you want to go back?

A.      No.

Q.      Even after the redevelopment?

A.      No.

Q.      All right.  So it's safe to say that some people that have lived in Tidewater
Gardens and then have moved out to places like Calvert Square or wherever, they
just don't want to come back; is that right?

A.      That's--that's correct.

Givens Dep. at 82-83.

In short, all of the injuries allegedly suffered by Ms. Givens have nothing whatsoever to

do with the City's implementation of the Plan.  By virtue of the implementation of the Plan,

Ms. Givens was given the opportunity to move from Tidewater Gardens to a unit that she *prefers*

in Calvert Square.  While Ms. Givens testified that she was concerned about the demolition of

her Calvert Square unit, it is undisputed that the Plan involves Tidewater Gardens alone, and that

there are no present plans to demolish the Calvert Square housing project.  Finally, Ms. Givens is

not being forced out of her home and deprived of an opportunity to return as she specifically

19

testified that she (and others similarly situated) would not want to return even after the redevelopment.  As Ms. Givens is happy with her current public housing accommodations and has no interest in returning, she has no standing.  *See Taliaferro v. Darby Tp. Zoning Bd.*, 458 F.3d 181 (3rd Cir. 2006) (plaintiff lacks standing to sue municipality over elimination of homes through urban redevelopment plan when plaintiff expresses no interest in returning). Accordingly, the allegations of the Amended Complaint concerning Ms. Givens' alleged injuries are demonstrably false.  As she has not been harmed, Ms. Givens has no standing in this suit.

(b)     Brandon Spratley

Both the allegations of the Amended Complaint and the interrogatory response related specifically to Brandon Spratley are inconsistent with Mr. Spratley's testimony.  Specifically, the Amended Complaint addresses Mr. Spratley in paragraph 10, which reads in its entirety as follows:

> Plaintiff Brendan Spratley is a disabled Black man who attends a community college and resides in Tidewater Gardens at 1007 Charlotte Street with his son. His unit is scheduled to be demolished as part of phase 2 of the Redevelopment Plan.

Amended Complaint ¶ 10.  Again, the City sought specific information concerning the "harm" suffered by Mr. Spratley, which the Plaintiffs included in their response to Interrogatory no. 6 which sought identification of "all injuries or harms" suffered by the individuals as a result of the Fair Housing Act violations alleged against the City.  The response concerning Brandon Spratley reads in its entirety as follows:

> Plaintiff Brandon Spratley previously lived in Tidewater Gardens, where the NHRA ignored numerous habitability issues such as exposed wiring and a missing smoke detector.  He was told he would have to leave his apartment as part of the Redevelopment Plan, and was given incomplete and opaque information regarding his relocation options.  After accepting a housing choice voucher for temporary relocation, Mr. Spratley was pushed to move into an apartment in a highly segregated, high poverty area in which a landlord would accept his voucher.  Mr. Spratley would like to return to St. Paul's Quadrant when it is

20

renovated, but believes he will not be able to due to a lack of suitable replacement housing in the new development.

Answer to Interrogatory no. 6.  Once again, Mr. Spratley's testimony demonstrates that the allegations of the Amended Complaint and the interrogatory response are inaccurate.

The clear implication in the Amended Complaint and the interrogatory response is that Mr. Spratley was forced to accept a HCV and was "pushed" to move into a highly segregated, high poverty apartment.  In fact, Mr. Spratley had been on the list for a HCV for *years*, even before he moved to Tidewater Gardens.  His testimony makes clear that he wanted a HCV to move *out* of Tidewater Gardens and into housing with more bedrooms so he could get custody of his children:

Q.      You were on a list, waiting for a housing choice voucher; is that right?

A.      Yes.

Q.      How long were you on the list?

A.      Over five years.

…

Q.      You signed up for that list while you were living at Tidewater Gardens?

A.      No, before.

Q.      Okay.

A.      Way before I moved out of Tidewater Gardens.

Q.      But you stayed on the list after you got into Tidewater Gardens?

A.      Yes.

Q.      Why?

A.      I wanted something better.

Q.      All right.  And you thought the housing choice voucher may be able to provide something better?

A.      Yes.

Spratley Dep. at 76-77 (excerpts attached as **Exhibit 5**).  In essence, the City's Plan allowed

Mr. Spratley to achieve his goal of finding better housing with more bedrooms *years earlier* as

he received a coveted voucher in connection with relocating from Tidewater Gardens and did not

have to wait in line for a HCV.

To the extent that the Amended Complaint and interrogatory responses suggest that

Mr. Spratley was forced to accept a housing choice voucher and move out of Tidewater Gardens

to an undesirable, highly segregated poverty-stricken neighborhood, the allegations are

misleading in every respect.  Clearly, Mr. Spratley had been waiting for a HCV even before he

moved into Tidewater Gardens, and he wanted a HCV so that he could use it to find *better*

housing.  What's more, Mr. Spratley's testimony is that by using the HCV he was able to move

to a location that is, indeed, better than Tidewater Gardens.

Q.      Is your duplex on Roseclair better?

A.      Yes.

Spratley Dep. at 77.  Of course, this testimony is directly contrary to the statement in the

interrogatory response which alleges that the harm he is suffering as a result of the Plan includes

"numerous habitability issues such as exposed wiring and a missing smoke detector."  Mr.

Spratley testified that he got the HCV he was after and moved into a duplex that he defines as

*better* than the unit he occupied at Tidewater Gardens.  *Carson v. Pierce*, 719 F.2d 931, 933 (8th

Cir. 1983) (case is moot when plaintiffs claim injury due to condition of housing but have now

moved to alternative housing).

The suggestion of both the Amended Complaint and the discovery response is that Mr.

Spratley would like to stay in Tidewater Gardens, but was forced to accept a HCV.  Contrary to

this implication, Mr. Spratley specifically testified that he would *never* give up his HCV to stay

in Tidewater Gardens.

> Q.      All right.  Did you ever consider giving up your housing choice voucher and just staying in Tidewater Gardens?
>
> A.      No.
>
> Q.      Why not?
>
> A.      Because other situations came up.
>
> Q.      I'm sorry.
>
> A.      Other situations came up--that have to-that-had to have my three-bedroom.

Spratley Dep. at 88-89.

In essence, Mr. Spratley testified that he wanted a HCV because it gave him the choice of finding housing with more bedrooms that would improve his chance of securing custody of his children.  Spratley Dep. at 57-58.  Once again, Mr. Spratley's testimony demonstrates that the redevelopment of Tidewater Gardens has *improved* his condition.  It was his desire to leave Tidewater Gardens, and the City's Plan allowed him to do so.  It was his desire to secure a HCV and the City's Plan allowed him to do so.  It was his desire to find affordable housing with more bedrooms, and the City's Plan allowed him to do so.  *Not one* of the harms alleged in the Amended Complaint and the discovery response is accurate.

> (c)      Evonne Bryant

Just like the other named Plaintiffs, the allegations in the Amended Complaint and discovery response concerning the "harm" or "injury" to Evonne Bryant turn out to be inaccurate.  Paragraph 8 of the Amended Complaint provides specific allegations concerning Bryant:

> Plaintiff Evonne Bryant is a Black woman who works full-time as a cleaner at a local hotel.  She resides in Tidewater Gardens at 1163 Holt Street.  Her unit is scheduled to be demolished as part of phase 1 of the Redevelopment Plan.

Amended Complaint ¶ 8.  In response to Interrogatory No.6 concerning "injuries" or "harms"

suffered by the individual Plaintiffs, the sworn response states the following concerning Bryant:

> Plaintiff Evonne Bryant was forced to move out of her home in Tidewater Gardens as part of phase 1 of the Redevelopment Plan.  She received incomplete information from the City and inadequate support from People First after she was told she had to leave her current apartment. Ms. Bryant indicated that she wanted replacement housing in Grandy Village, but she was forced to accept a housing choice voucher when the NHRA would not grant her approval to relocate. After being given misleading information about her options, including information for potential housing that would not accept her voucher, she found housing in Oakmont North, which is located in a highly segregated, high poverty area.  Ms. Bryant would like to return to St. Paul's Quadrant when it is renovated, but believes she will not be able to due to a lack of suitable replacement housing in the new development.

Response to Interrogatory no. 6.  Yet again, the allegations of the Amended Complaint and the information in the discovery response conflict with Ms. Bryant's testimony.

First, Ms. Bryant testified that she was interested in living in Grandy Village but that her application for public housing was initially denied due to her income, but that the decision ultimately was reversed.

> Q.      Do you know why you couldn't get into Grandy Village?
>
> A.      I don't--they said I made too much money.
>
> Q.      All right.  My--from your earlier testimony, my understanding was that you got assistance in getting that decision turned around is that accurate?
>
> A.      Yes.  They had--

Bryant Dep. at 78 (excerpts attached as **Exhibit 6**).  Ms. Bryant testified that once she was approved she did not renew her request to move to Grandy Village, but agreed to accept a HCV.

> A.      After I got unapproved, then I got approved, and I still didn't get the place that I wanted to go.  So they called me and stuff, and we sit in the room and stuff to talk about the voucher--what the voucher was all about, and the lady--Ms. Hannah told me she and stuff that she thought the voucher would be best for me, so I just went and took the voucher.
>
> …
>
> Q.      Did you tell her, I don't want a voucher?
>
> A.      No I did--no, I did not.  I couldn't get the apartment I wanted so what

other choice I had?

    Q.      Do you know why you didn't get the apartment in Grandy Village after you got the decision about qualifying reversed?

    A.      They didn't say--after I got the approval of getting the apartment, they didn't say why I still couldn't have the apartment.  No, didn't nobody tell me that. They just talking about vouchers.

*Id.* at 78-79.  In fact, Ms. Bryant testified that she never revisited her desire to move into Grandy

Village after she was approved for a housing choice voucher:

    Q.      … My understanding is after they denied you, you appealed that and got it reversed.  And I'm asking after it got reversed, did you go back to People First or NRHA and say, now that I qualify, I'd like to get into Grandy Village.

    A.      No, I did not.  Just like I said before, I was dealing with a situation at the time.  So I couldn't leave my mother and run and take care of everything else, because she is number one priority, so I had to take care of her first.

*Id.* at 93-94.

    The interrogatory response suggests that Ms. Bryant was forced into a "highly

segregated, poverty-stricken" neighborhood with the HCV.  But Ms. Bryant, like the other

named Plaintiffs, testified that a HCV allowed her to move to a *better* neighborhood that was less

segregated and less poverty-stricken than Tidewater Gardens.  Regarding her new neighborhood,

Ms. Bryant testified as follows:

    Q.      All right.  Do you have more different races in your current neighborhood than you had in Tidewater Gardens?

    A.      Yes, I--all the--only what I seen in Tidewater Gardens was all Black people.

    Q.      Okay.

    A.      Like--like me.

    Q.      Not--not as much that way at Oakmont North?

    A.      No, it's not.

Q.      …. Do you know whether Oakmont North has more or less poverty than Tidewater Gardens did?

…

Q.      If you don't--if you don't know, that's fine, Ms. Bryant, but I'm wondering if you think that the folks at Oakmont North, if it's--if there's more poverty there than there was at Tidewater Gardens?

A.      No, there's not.

Bryant Dep. at 82-84.

With regard to the allegation that Ms. Bryant would like to return she readily

acknowledged that both the City and NRHA have assured her she would have that right, but she

simply does not believe them:

Q.      I think I heard you testify earlier that you understood that NRHA has represented that you would be able to go back, you just don't believe them.  Is that accurate?

A.      Accurate. Yes, it is.

Bryant Dep. at 84-85.[4]

With regard to the allegation that People First did not provide assistance, that too turned

out to be false:

Q.      … Did you ever ask for help from People First and they told--and they just didn't give it to you?

A.      Some--there's a couple of ladies at People First, they did help me out, because they filled out the application for the--the other project that I wanted to go to and

… And--and then after that, I got a--they denied me of the place that I wanted to go and the other lady at People First, she filled out the paperwork for me so I can have a hearing.

…

---

[4] In fact, the City and NRHA have passed *resolutions* which provide that the residents will be able to return if they choose to do so, either to a PBV unit or a LIHTC unit using HCVs.  A copy of the City's resolution is attached as **Exhibit 7**.

Q.      All right.  What I'm--what I'm focusing on is, did you ask People First to help you with something, and People First or anybody from People First just wouldn't do it?

A.      No.  They done my credit--I asked them to help me with the credit report. The People First-two--the two ladies and stuff I was dealing with, they help me out a lot.  They done the credit report for me.  I got the credit report.  I couldn't read the credit report because I didn't understand it at all.  She stuck it in my mailbox.  I was at work and I came home, I had a letter in the mailbox, and it was a credit report.  I didn't understand it.  I could hardly see it.

Q.      Did you go back to People First and ask for help reading the credit report?

A.      I couldn't go back to People First at that time--at that time and stuff because my mother was ill and my mother was dying, so I had to run for their--the People First and get what they need.  I had to take care of my mother at the same time, and it was very, very stressful.

Bryant Dep. at 74-76.  Ms. Bryant testified repeatedly that People First provided assistance whenever she asked for it, but the problem was that she was distracted during most of the process and did not return to People First seeking help.  Indeed, Ms. Bryant testified that People First provided a great deal of assistance, and that the representatives of People First never refused to help her when she asked for help.  (*Id.* at 76.)

In short, because Bryant resided in a unit that had to be demolished in connection with the very early stages of the redevelopment, she applied for affordable housing in Grandy Village but was initially denied.  When the decision was reversed she *did not* try to relocate to Grandy Village, but instead accepted a Housing Choice Voucher and moved to Oakmont North, a neighborhood that is *less* segregated and *less* poverty-stricken than Tidewater Gardens.  While acknowledging the NRHA has promised her the right to return, Ms. Bryant simply does not believe them.

Thus, the *only* injury Bryant has "suffered" is that she had to move out of Tidewater Gardens to a less segregated, less poverty-stricken neighborhood.  While Ms. Bryant expressed a desire to move to Grandy Village, she did not press that desire when she was approved for

27

I-1678575.5

affordable housing.  Indeed, Bryant testified that she would not now give up her housing choice

voucher even if given the opportunity to move to Grandy Village.  (Bryant Dep. at 79-80).

Under these circumstances, Bryant has no standing as a plaintiff in this case.

     2.    *Conswayla Simmons*

Plaintiff Conswayla Simmons stands apart from the other individual Plaintiffs in that she

is not now nor has she ever been a resident of Tidewater Gardens or any other housing projects

within the St. Paul's Quadrant.  The allegations in both the Amended Complaint and the

discovery response are that Ms. Simmons is injured by the Plan because of some unspecified,

hypothetical longer wait for housing choice vouchers.  This is part of Plaintiffs' general theme--

if the City cannot solve all housing issues at the same time, it cannot legally address any of them.

The allegations of the Amended Complaint concerning Ms. Simmons are found in

paragraph 11 which reads as follows:

> Plaintiff Conswayla Simmons is a Black woman who currently resides at 3215
> Kimball Terrace in Grandy Village, a public housing community in Norfolk.  She
> has five children and works as a cleaner in commercial buildings in Norfolk.  She
> has been on the housing choice voucher waiting list for approximately 11 years.
> She has a serious roach infestation in her current apartment as well as on-going
> mold issues.  She has complained of a hole in her kitchen pantry but has been told
> by the maintenance staff that they don't have plaster with which to cover the hole.

Amended Complaint ¶ 11.  In the discovery response, Plaintiffs' sworn response concerning the

injury or harm to Ms. Simmons is as follows:

> By prioritizing households being relocated from Tidewater Gardens for vouchers
> that become available to the natural turnover of households leaving the program,
> the NRHA is prolonging the amount of time that households like Ms. Simmons
> remain on the waiting list.  Ms. Simmons is seeking a voucher because she would
> like to relocate to a home that provides a more suitable living environment for her
> household than Grandy Village. Thus, the Redevelopment Plan has prolonged her
> exposure to substandard living conditions.

Discovery Response at 6.  In her testimony, Ms. Simmons candidly admitted that all of the

information she has concerning the Plan and its implication on those individuals on the HCV

waiting lists come from her lawyers.  (Simmons Dep. at 63-65) (excerpts attached as **Exhibit 8**).
In fact, her understanding is just plain wrong.

The mistaken assumption underlying Ms. Simmons' standing is that residents of
Tidewater Gardens who are relocated due to demolition are getting HCVs that otherwise would
be available to those on the waiting lists.  Quite simply, *this is not true*.[5]  Tidewater Gardens
residents who have to relocate are given separate, independent tenant protection vouchers
("TPVs").  These TPVs are made available because of the elimination of public housing units in
Tidewater Gardens.  In other words, the TPVs *would not exist* absent the demolition of public
housing in Tidewater Gardens.  Moreover, the creation of TPVs does not add more HCVs which
are now available to those on the waiting list.  Instead, the TPVs are *specific* vouchers that are
made available to the Tidewater Gardens residents separate and apart from the HCVs available to
the general public, which are separately funded by HUD.[6]  The relevant HUD policy allows the
public housing authority to secure funding for a certain amount of TPVs "based upon the number
of occupied [public housing] units that will be demolished, sold or otherwise disposed of minus
the number of families that will move to other public housing units."  Thus, the policy creates
funding for *additional* vouchers based on *the elimination* of certain public housing units.  These

---

[5] This allegation is particularly confusing and underscores the weakness of Plaintiffs' theories in
this case.  For the Plaintiffs that lived in Tidewater Gardens, Plaintiffs argued that they were
injured, in part, by having to accept a voucher they claim cannot be used in areas of high
opportunity.  For Ms. Simmons, on the other hand, Plaintiffs claim an injury because she cannot
get a voucher fast enough.

[6] Attachment 48 to the Notice of Funding Availability ("NOFA") addresses vouchers "available
from the Tenant Protection Voucher Fund" and specifically includes a link to HUD's "notice"
regarding "Voucher Funding In Connection with the Demolition or Disposition of Occupied
Public Housing Units."  A copy of the notice is attached hereto as **Exhibit 9**.  The notice makes
clear that its purpose is to "describe the funding process for providing housing choice vouchers
('vouchers') in connection with the demolition or disposition of occupied public housing units"
and specifically applies to those public housing authorities "seeking vouchers for relocation or
replacement housing relating to demolition or disposition…"

I-1678575.5

vouchers *are not* available to the public generally, but only to those residents who are vacating the public housing units to be demolished.  As a result of this policy, residents relocating out of Tidewater Gardens will not be added to the HCV list (the list on which Ms. Simmons is now waiting) when those residents accept their TPVs.  They will receive TPVs independently funded through HUD.

With regard to the allegations concerning maintenance issues associated with her Grandy Village unit, these have nothing whatsoever to do with the City's Plan.  Accordingly, they can serve as no basis for standing.

**Conclusion**

For the foregoing reasons, the City of Norfolk moves to dismiss this case as none of the named individual or entity Plaintiffs have suffered an injury or harm as a result of the implementation of the Redevelopment Plan and, as such, have no standing in this suit.

Dated:  March 23, 2021                                Respectfully submitted,

CITY OF NORFOLK


By_____/s/_____
Gary A. Bryant (VSB No. 27558)
Brett A. Spain (VSB No. 44567)
Bethany J. Fogerty (VSB No. 94753)
Willcox & Savage, PC
440 Monticello Ave., Ste. 2200
Norfolk, Virginia 23510
(757) 628-5500 Telephone
(757) 628-5566 Facsimile
gbryant@wilsav.com
bspain@wilsav.com
bfogerty@wilsav.com

I-1678575.5

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23rd day of March, 2021, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

By_____/s/_____
Gary A. Bryant (VSB No. 27558)
Brett A. Spain (VSB No. 44567)
Bethany J. Fogerty (VSB No. 94753)
Willcox & Savage, PC
440 Monticello Ave., Ste. 2200
Norfolk, Virginia 23510
(757) 628-5500 Telephone
(757) 628-5566 Facsimile
gbryant@wilsav.com
bspain@wilsav.com
bfogerty@wilsav.com

I-1678575.5