**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | | |
|---|---|---|
| _____ ) | | |
| EVONNE BRYANT, et al., ) | | |
| ) | | |
| ) | | |
| Plaintiffs, ) | | Case No. 2:20-CV-00026 |
| ) | | |
| v. ) | | |
| ) | | |
| CITY OF NORFOLK, et al., ) | | |
| ) | | |
| ) | | |
| Defendants. ) | | |
| ) | | |
| _____ ) | | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT**
**CITY OF NORFOLK'S MOTION TO DISMISS FOR LACK OF STANDING**

Plaintiffs Evonne Bryant, Sylvia Givens, Brandon Sprately, and Conswayla Simmons (the "Individual Plaintiffs"), Residents of St. Paul's Quadrant Tenant Group (the "Tenant Group"), and New Virginia Majority (together with Individual Plaintiffs and the Tenant Group, "Plaintiffs") submit this Memorandum in Opposition to Defendant City of Norfolk's (the "City") Motion to Dismiss for Lack of Standing (ECF No. 140) (the "Motion to Dismiss").

## INTRODUCTION

The City's motion acknowledges its long history of intentional racial segregation in housing. Nor does it dispute the devastating effect of its discriminatory housing policies—including economic disinvestments, inequity in education and employment, and squalid living conditions—on Black residents who live in Norfolk's public housing . . Yet the Motion to Dismiss still makes the galling argument that the City's latest discriminatory redevelopment of public housing communities in the St. Paul's Quadrant area of Norfolk (the "Redevelopment Plan"), has

*improved* the lives of Individual Plaintiffs and, therefore, they have suffered no injury and lack Article III standing to assert claims against the City under the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, ("FHA").

In its rush to banish Individual Plaintiffs to yet another segregated section of Norfolk and carry on with its decades-long pattern of unrestrained housing discrimination, the City ignores completely well-established law that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing . . . .'" *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982) (internal citation omitted). Without question the FHA confers standing here, inasmuch as the City has violated the law by implementing the Redevelopment Plan, which has an unlawful disparate impact on Black residents of the St. Paul's Quadrant and Black residents of Norfolk. As members of a protected class, Individual Plaintiffs have standing to assert FHA claims against the City. Moreover, all Individual Plaintiffs but one have been displaced from their homes under the Redevelopment Plan. Such displacement—even on a temporary basis—is sufficient to confer standing. Notably, the City focuses solely on uncontextualized deposition snippets without grappling with this legal point at all.

The City's attempt to dismiss the FHA claims asserted by the Tenant Group and New Virginia Majority for lack of standing are similarly baseless. The Motion to Dismiss alleges that the Tenant Group is an illusory entity under state law and therefore lacks standing. But even a cursory review of Virginia law refutes this argument, particularly when the deposition testimony of the Tenant Group's representative, Lavonne Pledger, is considered in full and not selectively quoted to fit the City's narrative. The City also fails to mention that it recently moved to silence Mr. Pledger by ejecting him from the St. Paul's Area Advisory Committee established by the City

to review progress on the redevelopment—presumably because he was one of the few voices speaking out against the City's discriminatory plan and actions.  Likewise, the City's argument that New Virginia Majority sought to "create" standing by diverting resources is plainly contrary to Fourth Circuit precedent.  Under *Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012), and its progeny, New Virginia Majority has organizational standing because the Redevelopment Plan frustrated the organization's purpose and caused a drain on its resources.

No doubt the City would like to continue discriminating against Black residents and avoid a public airing of the merits of this case.  But the evidence clearly demonstrates that Plaintiffs have standing to assert FHA claims against the City.  Moreover, because the City has made a factual challenge of jurisdictional facts that are intertwined with the merits, the Court must decide the Motion to Dismiss under the summary judgment standard in Federal Rule of Civil Procedure 56.  For the reasons below, at a minimum there is a genuine dispute of material jurisdictional facts, the City is not entitled to judgment as a matter of law on the issue of standing, and the Court should deny the Motion to Dismiss.

## RELEVANT BACKGROUND[1]

### I.    A Segregated City and Its Lack of Affordable Housing

The city of Norfolk has a high level of racial residential segregation that results in significant economic disparities between white and Black families. *See* Ex. A, Parnell Decl. ¶¶ 17, 23.  Of particular relevance to this litigation is the area immediately east of downtown Norfolk, known as the St. Paul's Quadrant, and the three public housing projects therein: Tidewater Gardens, Young Terrace, and Calvert Square (together, "St. Paul's Public Housing").  *See* ECF No. 128 ¶ 2.  St. Paul's Public Housing consists of 1,674 housing units and houses approximately

---

[1] A comprehensive recitation of the facts underpinning this case is set forth in Plaintiffs' Amended Complaint.  This section summarize only those facts relevant to the Motion to Dismiss.

4,200 residents, including 2,000 children. *Id.*; Ex. A, Parnell Decl. ¶ 18.  Residents of St. Paul's Public Housing are overwhelmingly Black.  Ex. A, Parnell Decl. ¶ 18 (98% of households in Tidewater Gardens and Calvert Square; 97% of households in Young Terrace).  The average resident of St. Paul Public Housing earns $12,000 a year. *Id.* ¶ 22.  Nearly all St. Paul Public Housing residents are considered either very low-income or extremely low-income under both the federal poverty guidelines promulgated by the U.S. Department of Health and Human Services and the annual income categories set by Defendant U.S. Department of Housing and Urban Development ("HUD") for rental housing in Norfolk. *See id.* ¶¶ 11-16.  In stark contrast, Norfolk's downtown area—located adjacent to St. Paul's Quadrant—enjoys high employment opportunity and access to cultural assets, transportation, and community services and, critically, is majority white.  ECF No. 128 ¶¶ 29-30, 81, 127; *see also* Ex. A, Parnell Decl. ¶ 20.  As the City recognizes, "St. Paul's Boulevard [has] served as a segregation dividing line and separates these areas." *See* ECF No. 141-1 at 2.

Worse still is the fact that Norfolk suffers from a shortage of—and high demand for— affordable housing. *See* ECF No. 128 ¶¶ 100-101; *see also* Ex. B, Joyner Decl. ¶¶ 16, 24-25. Indeed, both Defendant Norfolk Redevelopment Housing Authority ("NRHA") and the City's expert, Phillip Kash, have acknowledged the shortage of affordable housing in Norfolk. *See* ECF No. 128 ¶ 100 (NRHA executive director John Kownack admitting to "shortage of affordable and acceptable housing in Norfolk and the region"); Ex. C, Tr. of Dep. of Phillip Kash (Mar. 11, 2021) at 406:22-407:8 (agreeing that the 2016 study recognizing shortage of affordable housing in Norfolk remains accurate).

## II.    The Redevelopment Plan and Phased Demolition of St. Paul's Public Housing

In January 2018, the Norfolk City Council passed a resolution authorizing NRHA to redevelop the St. Paul's Quadrant. *See* ECF No. 128 ¶79.  That September, in response to HUD's Notice of Funding Availability ("NOFA"), dated September 17, 2018, the City and NRHA jointly submitted an application to HUD (the "CNI Application") for a Choice Neighborhoods Initiative ("CNI") Implementation Grant to fund redevelopment of the St. Paul's Quadrant, including but not limited to the demolition of St. Paul's Public Housing (the "Redevelopment Plan"). *Id.* ¶¶ 72, 79; *see also* ECF No. 141-1 at 29 (discussing phased demolition of Tidewater Gardens, Young Terrace and Calvert Square).  In May 2019, HUD awarded NRHA and the City a $30 million CNI grant for the Redevelopment Plan.  *See* ECF No. 128 ¶ 2.  On July 27, 2019, Local Defendants entered into a Grant Agreement with HUD relating to the Redevelopment Plan. *Id.* ¶ 143.

## III.   The Redevelopment Plan Violates Tenants' Right of Return and One-for-One Unit Replacement Requirements under HUD's NOFA

According to HUD, the goal of CNI is to leverage "public and private dollars to support locally driven strategies that address struggling neighborhoods with distressed public . . . housing through a comprehensive approach to neighborhood transformation."  Ex. D, NOFA § I.A.1.  The transformation, however, cannot come at the expense of the existing residents of those distressed neighborhoods, and must ensure that current residents benefit from the transformation by maintaining affordable housing in the redeveloped area or providing residents with a choice to move to areas of high opportunity.  Ex. E, CNI Grant Agreement at NRHA00002626-27.  Towards that end, HUD's NOFA requires the City and NRHA to provide each Tidewater Gardens resident (as of the date of the CNI grant award) the opportunity to return to a replacement unit following redevelopment.  *See* Ex. D, NOFA § III.E.2.a.  Further, the NOFA requires  the one-for-one replacement of housing units in Tidewater Gardens to be located either (i) on-site at Tidewater

Gardens (as redeveloped); or (ii) in high-opportunity areas within 25 miles of Tidewater Gardens. *Id.* § III.E.2.b.  The Redevelopment Plan fails to comply with either requirement.

The CNI Application contemplates replacing the 618 affordable housing units at Tidewater Gardens with 709 units, of which only 200 would be affordable to the residents of Tidewater Gardens, while the remainder would be either so-called Low Income Housing Tax Credit or market-rate units (both unaffordable to current residents).  *See* ECF No. 141-1 at 4.  Following approval of the CNI Application, and in response to HUD criticism about the minimal number of replacement units, the City and NRHA agreed to modestly increase the number of on-site replacement housing units to 226.  *See* Ex. F, Letter from Ronald Jackson, Exec. Dir., NRHA, to Mindy Turbov, Dir., Choice Neighborhoods Program (Apr. 8, 2020) at NRHA00017231-33.  Even with this slight increase, the Redevelopment Plan fails to provide an adequate number of replacement affordable housing units such that every Tidewater Gardens resident will have the opportunity to return to a replacement unit following redevelopment.  As to the other 392 units at Tidewater Gardens, the City and NRHA proposes providing 309 Housing Choice Vouchers ("HCVs") and 83 Project-Based Vouchers ("PBVs"), purportedly to be used in high-opportunity areas (which under HUD rules must provide similar economic, health care, educational opportunities as will be provided in the redeveloped CNI area).  *See* ECF No. 141-1 at 4 (original proposal of 309 HCVs and 109 PBVs); Ex. F, Letter from Ronald Jackson, Exec. Dir., NRHA, to Mindy Turbov, Dir., Choice Neighborhoods Program (Apr. 8, 2020) at NRHA00017231-33 (reducing PBVs from 109 to 83 contemporaneous with increase in on-site replacement housing units).  Almost two years after approval of the CNI grant, not a single Tidewater Gardens resident has moved into a replacement unit that complies with HUD's NOFA—whether one of the 226

planned units on-site or in a high-opportunity area by virtue of one of the 83 PBVs.  Nor is it clear if or when that may ever happen.

As to utilization of HCVs in lieu of replacement units, under HUD's NOFA, HCVs may be used under an exception to the so-called "hard-unit" one-for-one replacement rule, but only if the city has a "soft" housing market (i.e., high vacany rates for rental housing).  *See* Exhibit D, at § III.E.2.b.6 (stating that a housing market is soft if rental vacancy rates are greater than 5.9 percent).  The rationale for limiting this exception to soft housing markets is that residents of demolished buildings will be able to find housing in areas of opportunity using vouchers only where the market is soft.  However, Norfolk is not a soft housing market.  *See* Ex. B, Joyner Decl. ¶¶ 29-34 (Norfolk's rental vacancy rate is well below the 5.9% threshold necessary to qualify as a "loose" housing market).  Thus, the Redevelopment Plan fails to comply with HUD's NOFA as to the one-for-one replacement requirement.

### IV.   Tidewater Gardens Residents—including Individual Plaintiffs—Have Been Pushed Out of Their Homes under the Redevelopment Plan and Have Been Relocated to Segregated Housing in Norfolk or Out of the City Altogether

The Redevelopment Plan requires virtually every Tidewater Gardens resident to vacate their home—years before any replacement housing is constructed.  As of March 31, 2021, NRHA reported that 310 of the 618 units at Tidewater Gardens are already vacant.  *See* Ex. G, Tidewater Gardens Relocation Dashboard (Apr. 8, 2021) at 2.  The City and NRHA intend to force every resident of Tidewater Gardens to leave by August 2022. *See* Ex. C, Tr. of Dep. of Phillip Kash (Mar. 11, 2021) at 437:15-22.

Indeed, each of the three Individual Plaintiffs who were residents of Tidewater Gardens has been forced to leave—either as a direct result of the Redevelopment Plan or because the NRHA intentionally allowed housing conditions to deteriorate in order to make Tidewater Gardens an undesirable place to live to encourage residents to leave.  *See* Ex. H, Tr. of Dep. of Lafeetah Byrum

(Nov. 17, 2020) at 226:7-227:1 (Ms. Givens forced to relocate due to terrible housing conditions); Ex. I, Tr. of Dep. Brandon Spratley (Nov. 16, 2020) at 55:7-8 (Mr. Spratley "displaced"); Ex. J, Tr. of Dep. of Evonne Bryant (Nov. 12, 2020) at 70:12-16 (Ms. Bryant felt NRHA "push[ed] us out").

And although they may be slightly better off than living in Tidewater Gardens as it currently exists, with its long history of disinvestment, lack of maintenance and deterioration, Individual Plaintiffs have been forced to relocate to areas of the City similarly characterized by segregation, poor conditions and high poverty.  Once more, the same is true for almost all 310 families that have been pushed out of Tidewater Gardens.  Indeed, expert analysis of the City's own data, including NRHA's Relocation Dashboards, has found that almost all displaced Tidewater Gardens residents are moving into highly segregated, often high poverty areas of Norfolk or out of Norfolk altogether and their children are ending up in low performing schools. *See* Ex. B, Joyner Decl. ¶¶ 45-55, 82-93.

In short, the City's characterization that its Redevelopment Plan is popular with residents of Tidewater Gardens is pure fantasy.  The only "broad support" for the Plan exists in the minds of City officials.  *See* ECF No. 141 at 1.  One need only read the local newspaper to see just how unpopular the Redevelopment Plan is to residents of St. Paul's Public Housing.  *See, e.g.*, Ex. P, Ryan Murphy, The Virginian-Pilot, *Norfolk's St. Paul's Redevelopment In National Spotlight Again In BET Doc* (March 19, 2021) (residents of St. Paul's Public Housing "don't trust the city to follow through on promises that those who want to return to the new [development] will be able to"); Ex. Q, Ryan Murphy, The Virginian-Pilot, *People Moving Out Of Norfolk Public Housing Are Mostly Ending Up In Other Poor, Racially Segregated Areas* (Feb. 15, 2021) (detailing one former Tidewater Gardens resident's struggle to relocate under the Redevelopment Plan and her

belief that most residents of St. Paul's Public Housing will "have to settle for a slum landlord"). In any event, popularity is not a defense to a discrimination claim brought under the FHA, let alone relevant to the Motion to Dismiss now before the Court.

LEGAL STANDARDS

**A.  Facial v. Factual Challenge to Subject Matter Jurisdiction**

The City moves to dismiss Plaintiffs' claims for lack of standing under Rule 12(b)(1) of the Federal Rules of Civil Procedure by challenging the truth of the jurisdictional allegations in Amended Complaint.  ECF No. 141 at 7-8.  In this situation, known as a factual challenge, the court's analysis turns on whether the jurisdictional facts are intertwined with the merits facts. *Kerns v. United States*, 585 F.3d 187, 196 (4th Cir. 2009).[2]  "When jurisdictional facts are not intertwined with the merits, the trial court may weigh evidence and resolve factual disputes to determine its jurisdiction."  *Kuntze v. Josh Enters., Inc.*, 365 F. Supp. 3d 630, 636 (E.D. Va. 2019) (citing *Kerns*, 585 F.3d at 196).  In such a case, "the plaintiff bears the burden of proving jurisdiction by a preponderance of the evidence." *Id.* at 636 (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)).

In contrast, where jurisdictional and merits facts are intertwined "the trial court should ordinarily assume jurisdiction and proceed to the intertwined merits issues."  *Kerns*, 585 F.3d at 193 (citing *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009)); *see also Kuntze*, 365 F. Supp. 3d at 638-39 (describing assumption of jurisdiction as "threshold analysis" that "is, essentially, a facial analysis").[3]  On the intertwined merits, the trial court must either deny

---

[2] Jurisdictional facts are not intertwined with merits facts when the former are "wholly unrelated to the basis for liability."  *Id.*

[3] A facial challenge attacks jurisdiction on the face of the complaint, "insofar as the complaint fails to allege facts upon which the court can base jurisdiction." *Id*. at 636.  A facial analysis

9

the Rule 12(b)(1) motion and proceed with the case <u>or</u> convert the Rule 12(b)(1) motion into a motion for summary judgment on the merits. *Kuntze*, 365 F. Supp. 3d at 636 (citing *Adams*, 697 F.2d at 1219). "Under either approach, the trial court is no longer making a jurisdictional decision under Rule 12(b)(1) and, instead, is making a decision on the merits under the summary judgment standard in Federal Rule of Civil Procedure 56." *Id.* at 639 n.8.

The Motion to Dismiss challenges the standing of Individual Plaintiffs and New Virginia Majority on the grounds that they have not suffered an injury in fact. *See* ECF No. 141 at 13-15. For liability to attach under a FHA disparate impact claim, a plaintiff must show, inter alia, "a disproportionately <u>adverse effect</u> on minorities." *See Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415 (4th Cir. 2018) (internal quotation marks and citation omitted) (emphasis added). Thus, jurisdictional and merits facts are intertwined as to both Individual Plaintiffs and New Virginia Majority and the Court must either deny the Rule 12(b)(1) motion and proceed with the case <u>or</u> convert the Rule 12(b)(1) motion into a motion for summary judgment on the merits. *Kuntze*, 365 F. Supp. 3d at 636.

The Motion to Dismiss challenges the Tenant Group's standing only insofar as it does not qualify as an unincorporated association under Virginia law and, therefore, lacks authority to sue. *See* ECF No. 141 at 8. Accordingly, the jurisdictional facts relevant to the Tenant Group are not intertwined with the merits of the Tenant Group's FHA claim and the Court "may weigh evidence and resolve factual disputes to determine its jurisdiction." *Kuntze*, 365 F. Supp. 3d at 636.

---

borrows from the Rule 12(b)(6) standard and, thus, a presumption of truthfulness attaches to the jurisdictional allegations in the complaint. *Id*. at 639 (quotation marks and citation omitted).

### B. Summary Judgment

"Summary judgment is appropriate only when 'there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996) (quoting Fed. R. Civ. P. 56(c)). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (internal quotation marks and citation omitted). "A fact is material if it might affect the outcome of the suit under the governing law." *Id.* (internal quotation marks and citation omitted). On a motion for summary judgment, the district court must view the facts and all justifiable inferences in the light most favorable to the nonmoving party. *Cole v. Wake Cnty. Bd. of Educ.*, 834 F. App'x 820, 821 (4th Cir. 2021). The court cannot weigh the evidence or make credibility determinations. *Jacobs*, 780 F.3d at 568-69.

### ARGUMENT

### I.      The Tenant Group is Not an Illusory Entity under Virginia Law.

The City incorrectly argues that the Tenant Group lacks standing because it is an illusory entity under state law. *See* ECF. No. 141 at 8. Relying on *Yonce v. Miners Mem'l Hosp. Ass'n*, 161 F. Supp. 178 (W.D. Va. 1958), the City claims that Tenant Group does not qualify as an unincorporated association under Virginia law because it purportedly lacks rules, bylaws, and disciplinary procedures, it does not know its own members, and there are no membership application or vetting processes. *See id.* at 13. As evidence of these allegations, the City cites fragments of the deposition testimony of Mr. Pledger, the Tenant Group's representative, to paint a picture of a disorganized group and an evasive witness. *See, e.g.*, *id.* at 10 ("Mr. Pledger deflected the question . . ."). What the City ignores, of course, is that Mr. Pledger is the representative of an informal, voluntary group of residents of three public housing communities in Norfolk who joined together to fight for better housing. He is not a sophisticated corporate officer; the members, rules

and practices of the Tenant Group are not sophisticated.  The City also ignores Virginia law, which does not require sophistication—let alone the myriad requirements listed in the Motion to Dismiss—for such a group to be recognized as an unincorporated association.

Under Virginia law, an "unincorporated association" is defined simply as "a collection of individuals gathered for a common purpose and 'is not a legal entity separate from the persons who compose it.'"  *Bedford Genealogical Soc., Inc. v. Bedford Museum & Genealogical Libr.*, No. CIV.A. 6:09-CV-00060, 2010 WL 2038843, at *3 n.4 (W.D. Va. May 21, 2010) (quoting Black's Law Dictionary, association (8th ed. 2004)).  The court in *Yonce* similarly defined "unincorporated association" as "a voluntary group of persons joined together by mutual consent for the purpose of promoting some stated objective."  161 F.Supp. at 186.  Under state law, such associations can sue or be sued in their own name.  *See* Va. Code § 8.01-15.  Relevant here, the Virginia Supreme Court has recognized that litigation brought on behalf of an unincorporated association need not be initiated by an *officer* of the association—only a member.  *See Brown v. Virginia Advent Christian Conf.*, 194 Va. 909, 912-13 (Va. 1953) ("this section contemplates that litigation brought pursuant thereto will be instituted by the officers of such unincorporated association or order who have charge of its affairs <u>or by members of the association</u> . . .") (emphasis added).  Thus, contrary to the insinuation in the Motion to Dismiss, an incorporated association need not have officers, only members.

The court in *Yonce* provided additional guidance as to several characteristics—not requirements—of an unincorporated association: voluntary membership; rules or by-laws; discipline for violations or non-compliance with the rules; and ability to prescribe conditions of membership, to enlarge or reduce membership, to enlarge or decrease the scope of activities, and to dissolve the association. *Yonce*, 161 F.Supp. at 186. Mr. Pledger's testimony demonstrates that

12

the Tenant Group has nearly all of these characteristics.  For example, he testified that the Tenant

Group was comprised of voluntary members, with membership restricted by certain criteria (e.g.,

residents of the St. Paul's Quadrant or allies of residents).  *See* Ex. K, Tr. of Dep. of Lavonne

Pledger (Nov. 9, 2020) at 18:7-20, 19:21-20:15, 25:15-23.  He also testified that the Tenant Group

has restrictions on membership, e.g., City and NRHA officials cannot attend, allies cannot vote.

*See id.* at 22:11-22, 23:20-23, 32:15-22, 40:20-25.  He testified that the Tenant Group has rules

that it follows, including voting by consensus.  *See id.* at 23:8-16, 27:23-25, 37:7-9, 181:7-182:16;

*see also id.* at 69:16-70:12 (standard process for calling a meeting).  And, although Mr. Pledger

may not have mirrored the legalese that counsel for the City was using to describe organizing

documents, he testified that the Tenant Group has "a few things that we've kind of drafted together

that I would consider articles, not necessarily bylaws."  *Id.* at 33:15-34:9.  Likewise, although

counsel for the City was displeased with Mr. Pledger's use of the word "secretary"—again, he is

not a sophisticated corporate officer—he clearly and more than once testified that individuals from

New Virginia Majority, including Lafeetah Byrum and Monet Johnson, facilitated meetings of the

Tenant Group, took notes, and "performed secretarial type work."  *Id.* at 35:6-18, 161:21-162:5;

*see also id.* at 37:21-39:25 (testifying, inter alia, that the Tenant Group does "not formally" have

a secretary but that "[their] facilitators take on most of that -- that role, that's why I refer to them

as facilitators").

      Concerningly, the Motion to Dismiss mischaracterizes Mr. Pledger's testimony several

times.  This also is consistent with the City's recent efforts to target Mr. Pledger for retribution for

speaking out against the City's discriminatory Redevelopment Plan.  *See* Ex. R, Ryan Murphy,

Virginian-Pilot, *A Norfolk Public Housing Resident Spoke Up About The St. Paul's Project. Now*

*He Says The City Is Punishing Him* (March 26, 2021).  For example, the City alleges that "Mr.

Pledger was unable to explain exactly what it takes to become a member" and "was unable to provide any information whatsoever concerning the group's governing documents, organizational structure, leadership or membership." *See* ECF No. 141 at 12.  As demonstrated in the paragraph above, those are not true, as indicated by the transcript of Mr. Pledger's deposition.  *See also* Ex. K, Tr. of Dep. of Lavonne Pledger (Nov. 9, 2020) at 37:12-38:12 (explaining that Ms. Byrum of New Virginia Majority possessed information on the identities and number of Tenant Group members).  Indeed, Ms. Byrum testified that the Tenant Group had approximately twenty members.  *See* Ex. H, Tr. of Dep. of Lafeetah Byrum (Nov. 17, 2020) at 30:3-32:12.  She also testified that she maintained the sign-in sheets for Tenant Group meetings.  *Id.* at 131:2-10, 233:17-234:10.

Based upon the foregoing, it is clear that the Tenant Group surpasses the minimal requirements to be considered an unincorporated association under Virginia law: it is a voluntary group of residents of St. Paul's Public Housing who joined together to fight for better housing and which maintains rules and procedures for membership, meetings, and votes.  Under *Yonce* and its progeny, the Tenant Group is an unincorporated association under state law.  Accordingly, the Motion to Dismiss must be denied as to the Tenant Group.

## II.     Plaintiff New Virginia Majority Has Suffered an Injury in Fact Sufficient to Establish Standing.

In the span of a single paragraph, the City's Motion to Dismiss incorrectly argues that (i) New Virginia Majority has not suffered an injury in fact because "any harm to the organization is self-inflicted by virtue of its own choices" to divert resources from its usual activities, and (ii) under *Lane v. Holder*, 703 F.3d 668, 674-75 (4th Cir. 2012), such a diversion is not sufficient to give New Virginia Majority standing.  *See* ECF No. 141 at 13-14.  In support, the City quoted an excerpt of New Virginia Majority's Answer to Interrogatory No. 9.  Critically, the Motion to

Dismiss completely omits the corporate representative deposition testimony of New Virginia Majority's two witnesses: Ms. Byrum and Jon Liss. *See* Ex. H, Tr. of Dep. of Lafeetah Byrum (Nov. 17, 2020); Ex. L, Tr. of Dep. of Jon Liss (Nov. 17, 2020). Mr. Liss, Co-Executive Director of New Virginia Majority, testified that this litigation falls within the scope of New Virginia Majority's ten-year vision, which lays out the organization's broad policy objectives. Ex. L, Tr. of Dep. of Jon Liss (Nov. 17, 2020) at 38:7-18, 40:13-16. He further testified that one of New Virginia's purposes is to help disadvantaged people in Virgina deal with the effects of climate change and sea level rise. *Id*. at 62:17-21.

Ms. Byrum explained that such efforts fall within the umbrella of "climate justice," as mentioned in the Answer to Interrogatory No. 9. Ex. H, Tr. of Dep. of Lafeetah Byrum (Nov. 17, 2020) at 40:4-16. She testified that the Redevelopment Plan implicates issues relating to climate justice and that New Virginia Majority opposes and "take[s] issue with" the City's approach, which displaces thousands of Black homes and residents under the guise of addressing flooding issues. *Id*. at 42:17-20, 43:18-44:6; *see also id.* at 98:14-99:8 (defining climate gentrification and testifying that the Redevelopment Plan is an attempt at gentrification of Tidewater Gardens). Notably, Counsel for the City who was taking the deposition recognized that climate justice is "an important issue for New Virginia Majority, and that the Redevelopment Plan implicates climate justice because there's flooding in the Tidewater Gardens development." *Id*. at 43:13-17. When asked, Ms. Byrum also confirmed that the reference to "Shark City" in the Answer to Interrogatory No. 9 relates to the issue of sea level rise. *Id*. at 45:12-15.

Against this fuller and more accurate picture of New Virginia Majority's mission, including the recognized "important issue" of climate justice and its relationship to the Redevelopment Plan, there is no question that New Virginia Majority's efforts to carry out its mission have been directly

impeded by the City's actions.  *See Lane*, 703 F.3d at 674-75 (recognizing a similar scenario as grounds for an organization's injury in fact sufficient to establish standing).  Although the Motion to Dismiss attempts to cast New Virginia Majority's injury as self-inflicted due to a diversion of resources to a non-primary purpose, the deposition testimony of the organization's representatives—elicited by the City's own counsel—clearly establishes that climate justice is a primary purpose and "important issue" for New Virginia Majority.  Thus, New Virginia Majority did not "diver[t]" resources from its usual activities and its harm is not self-inflicted.

Moreover, the Fourth Circuit has revisited the question of organizational standing since *Lane* and "reaffirmed that a plaintiff has suffered an organizational injury if the challenged policy or practice frustrated both its purpose and caused a drain on its resources."  *People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Maryland, Inc.*, No. 20-1010, 2021 WL 305546, at *3 (4th Cir. Jan. 29, 2021) (internal citation omitted).  Here, the evidence unequivocally establishes that climate justice is part of New Virginia Majority's mission and that the Redevelopment Plan has both frustrated that initiative and "caused a drain on [New Virginia Majority's] resources."  *Id*.  Thus, New Virginia Majority has organizational standing and the Motion to Dismiss must be denied as to the organization.

### III.   Each of the Individual Plaintiffs Has Suffered an Injury in Fact Sufficient to Establish Standing.

The Motion to Dismiss asserts that the injuries of Individual Plaintiffs as alleged in the Amended Complaint—"that they have been forced out of their homes and into poverty-stricken, highly segregated neighborhoods"—is not an injury. Instead, the City claims that Plaintiffs, "far from suffering injury or damage as a result of the City's Plan, … are now better-off."  ECF No. 141 at 15.  The City's argument is utterly without merit, as it ignores entirely the law on disparate impact claims.

Article III of the Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992).  One component of the case or controversy limitation on jurisdiction is the doctrine of standing.  *Id*. at 560.  In order to demonstrate standing, a plaintiff must show that three elements have been satisfied: (i) an injury in fact; (ii) a "causal connection between the injury and the conduct complained of;" and (iii) redressability, i.e., that the injury likely "will be redressed by a favorable decision" of the court.  *Id*. at 560-61 (quotation marks and citations omitted).  The Motion to Dismiss challenges only the first element—injury in fact—as to each Individual Plaintiff.  *See* ECF No. 141 at 15-16.

Standing under the FHA is "as [broad] as is permitted by Article III of the Constitution." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 108-09 (1979) (quotation marks and citation omitted); *see also Moseke v. Miller & Smith, Inc.*, 202 F. Supp. 2d 492, 497 (E.D. Va. 2002) (standing under the FHA is not limited by prudential principles (internal citations omitted)). The FHA defines an aggrieved person as "any person who claims to have been injured by a discriminatory housing practice."  42 U.S.C. § 3602(i)(1).  Courts have recognized that "'[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.'" *Saunders v. Gen. Servs. Corp.*, 659 F. Supp. 1042, 1053 (E.D. Va. 1987) (finding plaintiff had standing under FHA by virtue of allegations against defendant of discriminatory steering practices) (quoting *Havens Realty Corp.*, 455 U.S. at 373) . Here, each of the Individual Plaintiffs is a member of a protected class under the FHA.  *See* ECF No. 128 ¶¶ 8-11 (identifying each of the Individual Plaintiffs as African American); *see also Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities*, 576 U.S. 519, 530 (2015) (noting race is a protected class under the FHA).  Thus, Individual Plaintiffs have standing under the FHA by virtue of the facts alleged in the Amended Complaint—that the City's Redevelopment Plan will

have a disproportionate adverse impact on Black residents in violation of the FHA, *see, e.g.*, ECF No. 128 ¶¶ 1, 176—factual allegations which the Motion to Dismiss does not challenge, let alone present evidence to rebut.  For this reason alone, the Motion to Dismiss must be denied as to the Individual Plaintiffs.[4]

Each of the Individual Plaintiffs has suffered an injury in fact as a result of the City's Redevelopment Plan (and therefore has standing) for the additional reasons below.

### A.  Sylvia Givens

The Motion to Dismiss alleges that Ms. Givens has suffered no injury as a result of the Redevelopment Plan because: (i) she currently resides in Calvert Square, which is not within the scope of the Redevelopment Plan; (ii) she was glad to leave Tidewater Gardens and prefers Calvert Square; and (iii) she does not want to return to Tidewater Gardens.  *See* ECF No. 141 at 16-19. None of these allegations, accepted as true, preclude a finding that she has suffered an injury as a result of the Redevelopment Plan.  First, although Ms. Givens currently resides at Calvert Square, she previously was a resident of Tidewater Gardens.  *See* ECF No. 128 ¶ 9.  Further, she did not move out of Tidewater Gardens until *after* the City and NRHA submitted an Application to HUD for a CNI Implementation Grant to fund the Redevelopment Plan.  *See* ECF No. 128 ¶ 79 (Application submitted Sept. 2018); Ex. M, Tr. of Dep. of Sylvia Givens (Nov. 23, 2020) at 84:10-13 (testifying that she moved out of Tidewater Gardens on April 3, 2019).  Indeed, Ms. Givens testified that her unit at Tidewater Gardens was in the first phase of demolition scheduled under the Redevelopment Plan. Ex. M, Tr. of Dep. of Sylvia Givens (Nov. 23, 2020) at 15:4-6.  Accordingly,

---

[4] None of the four cases cited by the City for the principle that "a plaintiff has no standing when the challenged conduct results in no harm or injury" address the issue in the context of a disparate impact claim and, for this reason alone, should be rejected as wholly inapposite.  *See* ECF No. 141 at 15-16 (citing *Benham v. City of Charlotte*, 635 F.3d 129 (4th Cir. 2011); *Beck v. McDonald*, 848 F.3d 262 (4th Cir. 2017); *Cmty. Stabilization Project v. Cuomo*, 199 F.R.D. 327 (D. Minn. 2001); *Egan v. Davis*, 118 F.3d 1148 (7th Cir. 1997)).

Ms. Givens' necessary move to Calvert Square, whether temporary or permanent, constitutes a displacement with attendant costs and inconvenience sufficient to establish injury in fact. *See Dean v. Martinez*, 336 F. Supp. 2d 477, 486 (D. Md. 2004).

Second, Ms. Givens testified at length about the squalid conditions in her unit at Tidewater Gardens and how difficult it was to obtain maintenance services—so much so that she gave up on several basic repairs. *See* Ex. M, Tr. of Dep. of Sylvia Givens (Nov. 23, 2020) at 31:21-42:19 (identifying, among other problems not addressed by NRHA, mold, kitchen cabinets separating from the wall, cracked ceiling, and flooding); *see also* 32:19-20 (recounting incident where flood was not cleaned up for three weeks). Further, Ms. Byrum testified that Ms. Givens was forced to relocate from Tidewater Gardens because the NRHA intentionally allowed the conditions to deteriorate in order to make the community "a very undesirable place to live" to encourage residents to relocate. Ex. H, Tr. of Dep. of Lafeetah Byrum (Nov. 17, 2020) at 226:7-227:1. In light of the intentionally "terrible" conditions and maintenance at Tidewater Gardens, it is no surprise that Ms. Givens was glad to move to Calvert Square and believes her current unit is better by comparison. Ex. M, Tr. of Dep. of Sylvia Givens (Nov. 23, 2020) at 31:6-9, 38:4-5, 71:12-19. However, that does not negate the fact that she has moved from one poverty-stricken, highly segregated public housing project into another poverty-stricken, highly segregated public housing project in contravention of the requirements of the CNI Implementation Grant (the "Grant") awarded to the City and NRHA by HUD. *See* ECF No. 128 ¶ 85. Finally, that Ms. Givens does not want to return to Tidewater Gardens at present does not abrogate her standing under the FHA by virtue of the factual allegations in the Amended Complaint that the Redevelopment Plan will have a disproportionate adverse impact on Black residents in violation of the FHA. *See Saunders*, 659 F. Supp. at 1052.

### B.  Brandon Spratley

The Motion to Dismiss alleges that Mr. Spratley has suffered no injury as a result of the Redevelopment Plan because: (i) he placed himself on a waiting list to obtain a Housing Choice Voucher ("HCV") so that he could move to a larger, better apartment than his unit at Tidewater Gardens unit; and (ii) he obtained a HCV and moved to a larger, better apartment.  *See* ECF No. 141 at 20-23.  Again, these allegations do not preclude a finding that Mr. Spratley has suffered an injury as a result of the Redevelopment Plan.  Notably absent from the Motion to Dismiss is any reference to Mr. Spratley's testimony that he would consider moving back to Tidewater Gardens after the redevelopment.  *See* Ex. I, Tr. of Dep. Brandon Spratley (Nov. 16, 2020) at 15:17-16:9; 35:16-19 ("Q.  Were you evicted from Tidewater Gardens?  A. No.  Q.  Do you want to move back?  A.  If it's better, then yes.").  Similarly absent from the Motion to Dismiss is Mr. Spratley's testimony that he felt like he was "pushed out" of Tidewater Gardens.  *Id*. at 56:23-25.  He also testified that he waited over a year for a 3-bedroom unit at Tidewater Gardens—a condition for obtaining custody of his children—before giving up and moving to Roseclair.  *Id*. at 57:16-58:10. Critically, he also testified that he feels displaced (*id*. at 55:7-8), his apartment in Roseclair is not near any grocery stores that accept food stamps (*id*. at 55:10-12), his living expenses are higher (*id*. at 55:12-56:12), and his commute to the bus stop is twenty minutes longer than his commute when he lived at Tidewater Gardens (*id*. at 55:14-15, 56:13-20).  Any one of these facts, standing alone, is sufficient to establish an injury in fact.  *See Dean*, 336 F. Supp. 2d at 486.

### C.  Evonne Bryant

The Motion to Dismiss alleges that Ms. Bryant has suffered no injury as a result of the Redevelopment Plan because she received a HCV that "allowed her to move to a *better* neighborhood that was less segregated and less poverty-stricken than Tidewater Gardens."  ECF No. 141 at 25 (emphasis in original).  The City is presenting a false dilemma.  Both Tidewater

Gardens <u>and</u> the neighborhood where Ms. Bryant now lives, Oakmont North, are highly segregated areas. *See* Ex. J, Tr. of Dep. of Evonne Bryant (Nov. 12, 2020) at 82:8-11 ("Q. . . . you found housing in Oakmont North which is located in highly segregated, highly [sic] poverty area. … Is that accurate? A. Yes, it is."). Even if, as the City contends, Oakmont North is less segregated and less impoverished than Tidewater Gardens, it nevertheless is segregated and by no means an area of opportunity.

Ms. Bryant testified that she was forced to move out of her unit in Tidewater Gardens as part of the first phase of the Redevelopment Plan. *Id*. at 70:12-16 ("So I felt like, to me, they was pushing us out. Q. Now, did she say, I don't care if you're kicking and screaming, you got to leave? A. Yes, she did."). She also testified that if she had not been forced to move, she would have stayed in Tidewater Gardens (*id.* at 29:11-13) and that she wanted to move back (*id*. at 29:19-21). Finally, Ms. Bryant testified that her commute to work is now longer than when she lived at Tidewater Gardens. *Id*. at 64:16-65:3 (comparing previous commute of train and bus versus three buses now). As with the previous Individual Plaintiffs, any one of these facts, standing alone, is sufficient to establish an injury in fact. *See Dean*, 336 F. Supp. 2d at 486.

### D. Conswayla Simmons

The Motion to Dismiss alleges that Ms. Simmons has suffered no injury as a result of the Redevelopment Plan because she is not and has never been a resident of Tidewater Gardens or any other housing projects within the St. Paul's Quadrant." ECF No. 141 at 28. As such, the City asserts, she has suffered no injury as a result of the Redevelopment Plan—including being subject to longer wait times for HCVs—because "Tidewater Garden residents who have to relocate are given separate, independent Tenant Protection Vouchers ("TPV")." *Id*. at 29. The City argues that because the TPVs are separately funded and do not subtract from the number of available

HCVs, then there can be no harm caused to individuals on the HCV wait list (like Ms. Simmons) as a result of the creation of TPVs. *Id.* The flaw in the City's reasoning is twofold.

First, the NRHA prioritized distribution of HCVs to Tidewater Gardens residents whose units were in the first phase of demolition. *See* Ex. N, Minutes of Sept. 7, 2018 Workshop Meeting of NRHA Commissioners at NRHA00010404 (discussing reservation of 309 HCVs for families in Tidewater Gardens and plan to reserve additional HCVs for residents of Calvert Square and Young Terrace in the future); *see also* Ex. O, 2018 Annual Plan Significant Amendment (Oct. 11, 2018) (proposing HCV wait list preference to, inter alia, residents of St. Paul's Public Housing). Said differently, Tidewater Gardens residents not in the first phase of demolition—and all other individuals not in Tidwater Gardens (e.g., Ms. Simmons)—were deprioritized with respect to the HCV waiting list. At least 107 households left Tidewater Gardens during the period when NRHA distributed HCVs rather than TPVs. *See* ECF No. 128 ¶ 78.

Second, because Norfolk is not a "soft" market for affordable housing, demand increased for a constant number of (already few) housing units, resulting in a shortage of affordable housing. *See* Ex. B, Joyner Decl. ¶¶ 16-31. Thus, the City's argument that TPVs are separate and independent from HVCs is relevant only to the extent use of one is not reducing the opportunity to use the other—which is not the case in Norfolk.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny the City's Motion to Dismiss for Lack of Standing (ECF No. 140).

Dated: April 20, 2021                              Respectfully,

                                                   By: */s/ Stanley J. Brown*

                                                   Stanley J. Brown (VSB #40339)

David Baron (*pro hac vice*)
Zachary Siegel (*pro hac vice*)
Matthew Ducharme (*pro hac vice*)
David W.D. Mitchell (*pro hac vice*)
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
Tel: (212) 918-3000
Fax: (212) 918-3100
stanley.brown@hoganlovells.com
david.baron@hoganlovells.com
zachary.siegel@hoganlovells.com
matthew.ducharme@hoganlovells.com
david.mitchell@hoganlovells.com

Robert B. Wolinsky (*pro hac vice*)
Stevie DeGroff (*pro hac vice*)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC  20004
Tel: (202) 637-5600
Fax: (202) 637-5910
robert.wolinsky@hoganlovells.com
stevie.degroff@hoganlovells.com

Sarah Black (VSB # 70813)
Legal Aid Society of Eastern Virginia
125 St. Paul's Blvd., Ste. 400
Norfolk, VA 23510
Tel: (757) 627-5423
Fax: (757) 622-8102
sarahb@laseva.org

Thomas Silverstein (*pro hac vice*)
Edward George Caspar (*pro hac vice*)
Lawyers' Committee for Civil Rights Under Law
1500 K Street NW, Suite 900
Washington, DC 20005
Phone: (202) 662-8316
Fax: (202) 783-0857
tsilverstein@lawyerscommittee.org
ecaspar@lawyerscommittee.org

*Counsel for Plaintiffs*